**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**WILLIAM E. SMITH,**

     **Plaintiff,**

**v.**                                     **Case No.:  3:12-cv-07358**

**CORRECTIONAL OFFICER BERLIN;
CORRECTIONAL OFFICER MARCUM;
CORRECTIONAL OFFICER BLANKENSHIP;
CORRECTIONAL OFFICER GOODWIN;
CORRECTIONAL OFFICER VANMETER;
CORRECTIONAL OFFICER LAMBERT,
and MICHAEL CLARK,**

     **Defendants.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

On November 5, 2012, Plaintiff William E. Smith ("Smith"), proceeding *pro se* and then incarcerated at the Western Regional Jail in Barboursville, West Virginia, filed a complaint under 42 U.S.C. § 1983, alleging that he had been the victim of physical and verbal abuse at the Jail and requesting declaratory and injunctive relief, as well as money damages. (ECF No. 2). Smith has since been transferred to the custody of the State of Ohio where he remains incarcerated. This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for total pretrial management and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3).

1

Pending before the Court are the Motion for Summary Judgment of Defendants Goodwin and Vanmeter, (ECF No. 170), Motion for Summary Judgment of Defendants Berlin and Blankenship, (ECF No. 173), and Motion for Summary Judgment of Defendants Clark and Lambert. (ECF No. 175). Plaintiff has filed a Motion in Opposition to the motions for summary judgment along with a supporting memorandum, (ECF Nos. 180, 181), and Defendants Goodwin, Vanmeter, Berlin, Blankenship, Clark and Lambert have filed reply memoranda. (ECF Nos. 182, 183, 184). After carefully considering the arguments of the parties and the attached exhibits,[1] the undersigned **FINDS** that there are no genuine issues of material fact that preclude the entry of judgment in favor of Defendants Goodwin, Vanmeter, Clark, Berlin, and Blankenship, and these defendants are entitled to dismissal of the complaint against them as a matter of law. Therefore, the undersigned respectfully **RECOMMENDS** that their Motions for Summary Judgment be **GRANTED,** (ECF Nos. 170, 173, 175), and these defendants be removed from the style of the case.

On the other hand, the undersigned **FINDS** that genuine issues of material fact preclude the entry of summary judgment on behalf of Defendant Lambert. (ECF No. 175). Moreover, Defendant Marcum has not filed a motion for summary judgment, and he is not entitled to a dismissal in light of the evidence contained in the record. Accordingly the undersigned also **RECOMMENDS** the following:

1.     That the motion for summary judgment of Defendant Lambert be **GRANTED**, in part, and **DENIED**, in part. (ECF No. 175). All of Plaintiff's claims against Defendant Lambert, except the claims based upon supervisory liability and

---

[1] Plaintiff filed a motion for leave to file Supplemental Exhibits. (ECF No. 189). The Court **GRANTS** that motion and has considered the exhibits in preparing this Proposed Findings and Recommendations. However, the Court **DENIES** Plaintiff's Motion to compel discovery of video tape recording as untimely. (ECF No. 188).

retaliation, should be dismissed. Plaintiff's claims against Defendant Lambert based upon supervisory liability and retaliation should proceed to trial;

2.      That the Motion of William Smith in Opposition to Defendants' Motions for Summary Judgment be **GRANTED**, in part, and **DENIED**, in part. (ECF No. 180). In addition to the above-stated claims against Defendant Lambert, Plaintiff's causes of action against Defendant Marcum based upon the use of excessive force in violation of the Eighth Amendment to the United States Constitution and upon a State claim of battery should also proceed to trial. However, all remaining causes of action should be dismissed;

3.      That the presiding District Judge reopen Plaintiff's motion for the appointment of counsel, (ECF No. 88),  and reconsider appointing counsel to assist Plaintiff at the trial of this civil action; and

4.      That the presiding District Judge issue a final pretrial and trial schedule.

## I.     <u>Factual Allegations/Relevant History</u>

### A.     **The Physical Assault**

William Smith, a convicted felon in the State of Ohio, absconded from parole and made his way to West Virginia. He was eventually arrested in the Fall of 2012. On October 19, 2012, Smith was transferred from the Tygart Valley Regional Jail to the Western Regional Jail in Barboursville, West Virginia where he was held on charges of grand larceny pending in the Circuit Court of Putnam County, West Virginia. After being booked and taken to his cell, Smith realized that there was no mattress for him to sleep on, so he requested one from the nearest correctional officer, Defendant Berlin. Smith was not given a mattress; instead, he was told by Berlin to "see [him] when [his] shift

[was] over." (ECF No. 180-3 at 2). That night, Smith slept on the concrete floor.

The following day, Smith complained to Berlin that he had never received a mattress and asked if he would have to file a grievance in order to get one. (*Id.* at 2-3). The inmates in Smith's pod warned him not to press Berlin for a mattress or "mess" with the correctional officers because they "beat down" inmates that "messed" with them. (*Id.*). Smith was told stories of a "posse" of officers that included Berlin, Defendant Blankenship, and Defendant Marcum that routinely assaulted and harassed the inmates.

Around 10:30 p.m. on the night of October 20, 2012,[2] the inmates were watching television in the common area of the pod, when the television set suddenly turned off, and Defendants Berlin, Goodwin, Vanmeter, Blankenship, and Marcum entered the pod. They ordered an immediate lockdown, which sent all of the inmates scurrying to their cells and closing the doors. (*Id.*). At that point, Berlin began calling for Smith, using an expletive for his name. Berlin and the others came to Smith's cell. The door was opened, and Berlin approached Smith, while the other correctional officers horseshoed around them. The correctional officers began to verbally harass and taunt Smith. They told Smith to come with them so they could "go get [him] a mattress." (ECF No. 180-3 at 4). The other inmates urged Smith not to go with the officers, but he went with them as ordered. Smith and the officers walked through a couple of doors and down a hallway. The correctional officers ordered Smith to "get on the wall," at which point Smith believed he was going to be assaulted because the other inmates had warned him that the officers usually placed the inmates on the wall just before they beat them. Instead, the correctional officers continued to verbally assault Smith, shouting obscenities and insults in his ears. They then led Smith to a room that was completely dark except for

---

[2] The date of the assault is unclear in the record and may have been October 19, 20, or 21, 2012.

4

one light located toward the back wall of the room. (*Id.*). Smith again believed that the guards intended to beat him in this room; however, they instructed him to go in alone and get a mattress. When Smith told them he did not see any mattresses, they pointed to a partition in the darkest part of the room and told him the mattresses were behind the partition. Smith went behind the partition and found a stack of mattresses. (*Id.*). He took one, and returned to the officers. Smith and the officers began the walk back to the pod. On the return trip, the officers continued to verbally insult and taunt Smith, but they did not physically assault him. (*Id.*).

Once back at his cell, Smith claims that he was standing in the threshold facing the correctional officers. (ECF No. 180-3 at 4-5). The other inmates were still locked down in their own cells, and Smith's cellmate had turned away to avoid getting involved. Defendant Marcum moved in front of Smith while Berlin, Blankenship and the others surrounded them just outside the cell. Marcum began to poke Smith in the chest, calling him a "smart ass" and making other derogatory remarks. Smith briefly looked over at Berlin, who was smiling, when suddenly Marcum punched Smith in the jaw two times, knocking Smith's head against the door frame of the cell. Accordingly to Smith, the blows did not knock him down, but they did dislodge and crack in half a partial denture in his mouth, and he later learned that his jaw was dislocated and broken. After the punches were thrown, Marcum told Smith he was "lucky," and "[didn't] know how fucking lucky [he was]." At that point, Berlin said, "Let's go," and the correctional officers left. (*Id.* at 5-6). Smith surmises that the officers had planned to provoke him into a physical altercation, so that they would have an excuse to beat him. When he refused to take their bait, Marcum gratuitously punched Smith, and the others left disappointed.

Smith alleges that he tried to report the assault that night, but could get no assistance. (ECF No. 180-3 at 5-7). However, the following day, he had to appear at court for a hearing on his larceny charge and reported the incident to his attorney. His attorney encouraged Smith to file a grievance and to seek medical attention; particularly, as Smith believed his jaw had been dislocated by the blows. However, when Smith returned to the Jail, the other inmates discouraged him from seeking treatment, advising him that if he requested treatment, he would probably get another beating and would end up in "the hole," their name for the isolation unit. (*Id.* at 7). Instead of requesting medical care, Smith decided to file a formal grievance. (*Id.*).

On the night of October 22, 2012, Smith was in his cell resting when he was roused by Berlin, who told Smith to pack his things, because they "got a new home" for him. (ECF 173-2 at 9). Without letting Smith take his things, however, Berlin escorted Smith from his cell to a room to meet with Defendant Lambert, the supervisor responsible for investigating Smith's charges. (ECF No. 175-2 at 10). With Berlin present, Lambert made it clear to Smith that he was aware of what had happened, and he was not inclined to assist Smith. (*Id.*). Smith prepared a statement at Lambert's request, which Lambert witnessed, documenting the assault and noting that Berlin had just pulled Smith from his cell. (ECF No. 141-5 at 10).

Smith asked for a medical evaluation, so Lambert took Smith to the Medical Unit. According to Smith, Lambert spoke to the nurse privately for about five minutes, then brought Smith into the examining room. (ECF No. 175-2 at 10). Despite Smith's complaints about his jaw, the nurse did not examine his jaw, and she refused to order an x-ray. The nurse's notes do not reflect any complaints relating to Smith's jaw, nor do they document any examination of his facial area, although the description of the assault

6

(inmate "states he was hit and knocked his head against doorframe toward rt back of head") is consistent with Smith's version of being hit in the face. (ECF No. 173-6). The nurse merely told Smith she could find no evidence of lumps, bumps, or bruises on his head. She informed Smith he could return to the general population. (*Id.*).

### B.     The Isolation Unit

As Smith and Lambert left the Medical Unit, Lambert told Smith that he had "a new home" for him. (ECF No. 173-2 at 10). Smith protested, indicating that he did not have any of his belongings. Lambert led Smith down a long hallway and finally instructed a correctional officer to take Smith to a specific cell number. When Smith asked where he was going, Lambert told him, "Well, you're going to an isolation unit." (*Id.*). Smith again protested, arguing that he had not committed any infraction that merited his placement in isolation. Lambert did not give Smith any reason for his transfer to isolation. The following day, Smith learned from the individual handing out food trays that the official reason given for his placement in isolation was "protective custody." (*Id.*). Smith remained in isolation until November 21, 2012, a total of thirty-eight (38) days, before being returned, without explanation, to the general population. (ECF No. 141-5 at 3). (*Id.*). His release came only after he filed a federal lawsuit and moved for emergency injunctive relief seeking his immediate release from segregation.

Records produced by the Jail in discovery present a different version of what occurred on the night of October 22, 2012. First, Defendant Berlin completed an incident report that indicates that on the night of October 22, he was walking through Smith's pod when an inmate flagged him down to report that Smith had locked himself in his cell. (ECF No. 173-4). This prompted Berlin to order Smith's cell to be remotely opened, to order Smith to pack his things, and to request from Booking "new housing"

for Smith. Booking informed Berlin that Smith could be moved to Pod C 4, Cell 7. Smith then complained that Berlin was harassing him and asked to speak with the shift commander. Berlin took Smith to an interview room and asked Sergeant Lambert to come and speak with Smith. (*Id.*).

According to an incident report prepared by Sergeant Lambert, he was asked by Berlin to come and speak with Smith. (ECF No. 173-5). Smith told Lambert that he had been assaulted by Berlin and others on October 19, 2012. Lambert then sent Smith to the Medical Unit to be checked by a nurse, and when he returned, asked Smith to write a statement. Smith told Lambert he had already reported the assault to his attorney and the Putnam County Judge. Lambert went to Smith's pod to investigate the allegations and spoke with every inmate in the section. (*Id.*). They all said Smith was "nuts;" that he was an inmate lawyer; and they wanted nothing to do with him. Lambert sent another officer to take statements from the inmates, while he went and "rehoused" Smith to "A-8-3" (an isolation cell) "for his protection per his request." (*Id.*).

A final piece of paperwork, titled an Inmate Reclassification Summary, was also prepared that night. (ECF No. 141-5 at 12; ECF No. 187 at 37). This form, completed by C.O. Cazad, indicates that Smith was placed in protective custody pursuant to the orders of Sergeant Lambert "due to strange behavior by inmate." (*Id.*). Clearly, this record is inconsistent with Lambert's incident report. In any event, Smith vehemently denies that he requested protective custody, or that he was behaving strangely. To the contrary, Smith claims that Lambert placed him in isolation to punish him for filing the grievance, to prevent him from reporting and proving his injuries, and from having access to the courts. He alleges that Lambert achieved this by falsifying records and bypassing procedural safeguards. (141-5 at 2, 12).

8

### C.      Events after Institution of the Lawsuit

While still in protective custody, Smith filed the complaint herein. Eleven days later, on November 16, 2012, Smith filed a motion for emergency preliminary injunctive relief, claiming that he had been placed in punitive isolation by Defendant Lambert in retaliation for his efforts to access the courts in order to uncover and put an end to the abusive actions of Defendants Berlin, Blankenship, and Marcum, and asking the Court to intervene, secure his release from isolation, and prohibit the continued abuse. (ECF Nos. 7, 8). Unbeknownst to Smith, one day earlier, the Western Regional Jail had suspended without pay Defendants Berlin, Blankenship, Marcum, and Lambert pending an investigation into charges that they had used excessive force in dealing with inmates; in particular, with an inmate that had been beaten in the recreational area a few days before the alleged assault on Smith. Ultimately, Berlin and Marcum were terminated by the Jail for inflicting or allowing for the infliction of significant physical injuries to an inmate while in their custody on October 17, 2012, and for failing to submit true, complete, and accurate accounts of their actions in regard to the inmate. (ECF Nos. 180-1 at 5-8, 9-12). In addition, Lambert was terminated from employment for his involvement in the beating of the inmate, whom Lambert had placed in an emergency restraint chair at the time of the assault; his failure to videotape events that by policy should have been videotaped, his failure to carry out supervisory duties; and his failure to submit true, accurate and complete reports regarding the treatment of the inmate. (*Id.* at 16-19).

## II.    <u>Standard of Review</u>

The Court is required to liberally construe *pro se* complaints, such as the one filed in this civil action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d

1081 (2007). However, even under this less stringent standard, the complaint still must contain sufficient factual allegations to support a valid legal cause of action. The court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), develop the plaintiff's legal theories for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 501 U.S. at 248. Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). The court shall "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Consequently, motions for summary judgment impose a heavy burden on the moving party; for, it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990).

Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50).

## III.   Plaintiff's Claims

Smith asserts multiple claims against the various defendants, including the following:

1.      All of the defendants were deliberately indifferent to Smith's medical and mental health needs;

2.      All of the defendants engaged in cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

3.      All of the defendants were guilty of the assault and battery of Smith;

4.      Defendant Marcum used unnecessary and excessive force;

5.      Defendants Clark and Lambert are responsible under a theory of supervisory liability;

6.      Defendants Blankenship, Berlin, and Lambert are liable for retaliation;

7.      All defendants are guilty of conspiring to violate Smith's civil and constitutional rights; and

8. All defendants are liable for damages to Smith under the Americans with Disabilities Act ("ADA").

## IV.   <u>Discussion</u>

During Smith's incarceration at the Western Regional Jail, he was a convicted felon from the State of Ohio who had absconded from parole. However, he was being held at the Western Regional Jail on charges pending in Putnam County, West Virginia. At different times, the Jail classified Smith as both a convicted felon and a pretrial detainee. If categorized as a pretrial detainee, some of Smith's constitutional claims would be governed by the due process clause of the Fourteenth Amendment, rather than the cruel and unusual punishment clause of the Eighth Amendment. *See Hill v. Nicodemus,* 979 F.2d 987, 990–92 (4th Cir.2013). However, as the principles underlying these Amendments are essentially the same, courts generally do not differentiate between them when resolving a pretrial detainee's claims under § 1983. *Id.*

### A.   *Assault, Battery, and Excessive Force*

Smith's excessive force and assault and battery claims arise from the incident in his cell where Defendant Marcum allegedly punched Smith in the face two times, dislocating and fracturing his jaw and breaking his partial denture. The use of excessive force against an inmate by a correctional officer plainly violates the Eighth Amendment's cruel and unusual punishment clause, *Wilkins v. Gaddy,* 559 U.S. 34, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010), and is cognizable under 42 U.S.C. § 1983. On the other hand, Smith's claim of assault and battery is a matter of state tort law and is not properly asserted under § 1983. *See Gray v. Bd. of Cty. Commrs. of Frederick Cty, Md.,* 551 F.App'x 666, 677 (4th. Cir 2014) (a constitutional claim of excess force and a state criminal charge or tort claim of assault and battery charge are based on distinct legal

concepts and foundations). Under West Virginia law, the legal phrase "assault and battery" is used to refer to the tort of battery. The Restatement (Second) of Torts, § 13 (1965), sets out the elements of the tort of battery as follows:

> An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.

*Tolliver v. Kroger, Co.,* 201 W.Va. 509,517, 498 S.E.2d 702, 710 (1997) (quoting *Funeral Services by Gregory, Inc. v. Bluefield Community Hosp.,* 186 W.Va. 424, 413 S.E.2d 79, syl pt. 1 (1991) ("In order to be liable for a battery, an actor must act with the intention of causing a harmful or offensive contact with a person."), overruled on other grounds, *Courtney v. Courtney,* 190 W.Va. 126, 437 S.E.2d 436 (1993). Essential to a claim of battery is the element of contact. Here, Smith concedes that Marcum is the only defendant that had contact with him. Accordingly, to the extent that Smith asserts claims of battery against the other defendants, they are entitled to summary judgment on those claims. Defendant Marcum has not moved for summary judgment; therefore, Smith may pursue his state battery claim against Marcum.

To establish a constitutional claim of excessive force, Smith must show that the defendants "inflicted unnecessary and wanton pain and suffering." *Taylor v. McDuffie,* 155 F.3d 479, 483 (4th Cir.1998) (quoting *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). Thus, there is a subjective component to the claim in that the defendants must have "acted with a sufficiently culpable state of mind." *Williams v. Benjamin,* 77 F.3d 756, 761 (4th Cir. 1996). Objectively, the injury inflicted on the inmate must be "sufficiently serious." *Id.* However, the predominate focus is not on the severity of the injury because when prison officials "maliciously and sadistically use

force to cause harm, contemporary standards of decency always are violated whether or not significant injury is evident." *Wilkins v. Gaddy,* 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010). "The proper inquiry is whether the force applied was in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Taylor,* 155 F.3d at 483. "In determining whether [this] constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." *Orem v. Rephann,* 523 F.3d 442, 446 (4th Cir. 2008) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

Defendants Clark and Lambert argue that Smith's excessive force claims should be dismissed against them as a matter of law given that they were not present at the time Defendant Marcum allegedly struck Smith. Consequently, Smith cannot factually link Clark and Lambert to this cause of action. The undersigned agrees. For the most part, liability under 42 U.S.C. § 1983 is personal in nature, based upon a defendant's own constitutional violations. *Monell v. Department of Social Services of the City of NY,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Therefore, the excessive force claims against Clark and Lambert should be dismissed.

For that same reason, the excessive force claims against Defendants Berlin, Blankenship, Goodwin, and Vanmeter must also be dismissed. Although these defendants were present during the incident and allegedly taunted and verbally harassed Smith, there is no evidence that anyone other than Defendant Marcum physically assaulted Smith. Indeed, Plaintiff concedes in his deposition testimony that,

14

"[t]he only one that physically assaulted me was Marcum." (ECF No. 180-3 at 8). The law is well-established that "mere threats or verbal abuse, without more, do not state a cognizable claim under § 1983." *Wilson v. McKeller,* 254 F.App'x. 960, 961 (4th Cir. 2007), citing *Northington v. Jackson,* 973 F.2d 1518, 1524 (10th Cir. 1992); *Carter v. Morris,* 164 F.3d 215, 219 n. 3 (4th Cir. 1999). Verbal harassment and threatening conduct, even to an extent that they cause an inmate fear or emotional anxiety, do not rise to the level of a cognizable constitutional claim. Notwithstanding the other defendants' presence and participation in the alleged intimidation of Smith, only Marcum allegedly struck Smith. Therefore, only Marcum can be accused of using excessive force.

Marcum has not moved for summary judgment on this claim, although he denies striking Smith. Consequently, a genuine issue of material fact exists, and Smith has presented sufficient evidence to proceed to trial. Viewing the evidence in the light most favorable to the plaintiff, at the time Marcum allegedly struck Smith twice in the jaw, there was no justification for the use of force. Smith was simply standing in his cell after having collected a mattress, and was waiting for the correctional officers to leave. There is no evidence that Smith was causing a disturbance, was resisting instruction or orders from the officers, or was inciting other inmates. Thus, it is reasonable to conclude that Marcum applied force "maliciously and sadistically for the very purpose of causing harm" rather than in a good faith effort to maintain or restore discipline. *See Whitley v. Albers*, 475 U.S. at 321. Smith will testify that the blows to his jaw caused his partial plate to break, and his jaw to become dislocated and broken. He was unable to eat for several days and experienced considerable pain and psychological distress. Given the circumstances surrounding the alleged assault, Smith's evidence regarding his injuries is

adequate to move forward. *See e.g., Hudson v. McMillian,* 503 U.S. 1, 10, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) (bruising, swelling, loosened teeth and cracked dental plate not *de minimus* for Eighth Amendment purpose); *Wilkins,* 559 U.S. at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.")

Accordingly, the undersigned **FINDS** that Defendants Berlin, Blankenship, Goodwin, Vanmeter, Lambert, and Clark are entitled to summary judgment on Plaintiff's battery and excessive force claims against them. The undersigned further **FINDS** that Defendant Marcum has not moved for summary judgment on these claims, and there is sufficient evidence in the record for Plaintiff to proceed to trial against him.

### B.   *Deliberate Indifference to Medical Needs*

Smith alleges that the defendants were deliberately indifferent to his medical needs when they failed to respond to his requests for medical attention after Marcum punched Smith twice in the face. A prison official violates an inmate's rights under the Eighth Amendment to the United States Constitution when the official acts with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve,* 535 F.3d 225, 241 (4th Cir. 2008). The official is "deliberately indifferent" to a serious medical need when he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To succeed on such a claim, Smith must show that his medical condition was

16

indeed serious, when measured objectively, and that the defendants were subjectively aware that Smith needed medical attention. *Id.* While "deliberate indifference entails something more than mere negligence ... [it] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *Grayson v. Peed,* 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.").

In his amended complaint, Smith states that the defendants "displayed a deliberate indifference to your plaintiff's serious medical needs on October 21, 2012 through October 23, 2012 directly after defendant Marcum broke Plaintiff's jaw by locking him down, then placing him in isolation for a month and taking his complaints of pain as frivolousness." (ECF No. 21 at 5). While a broken jaw does qualify as a serious medical condition under the objective component of an Eighth Amendment claim, *see Brice v. Virginia Beach Correctional Center,* 58 F.3d 101 (4th Cir. 1995), the record simply does not support a finding of deliberate indifference sufficient to meet the subjective component of the claim.

According to Smith, the assault occurred as he stood in the threshold of his cell. (ECF No. 180-3 at 4-6.).  Marcum walked up to Smith and began to poke him in the chest. The other officers were outside of the cell, standing in a half circle around the threshold. Smith looked over at Berlin, and was suddenly hit twice in the jaw by Marcum. The blows knocked Smith's head against the door frame, but Smith did not fall to the ground. (*Id.*). His partial denture was knocked loose, but Smith managed to keep it in his mouth. Smith was unaware at the time that his partial was broken. He did not say anything to any of the officers at the time. Marcum then told Smith he was "lucky," and Berlin followed up by saying, "let's go." The officers left. (*Id.*). Smith testified at

17

deposition that he immediately tried to contact someone to report the assault; however, no one responded. His pod was on lockdown the entire night. Smith indicated that overnight, he developed a lump on the back of his head where it hit the door, and his jaw became swollen. The next morning, he realized his jaw was dislocated. (*Id.* at 7). He had a court appearance scheduled, and reported the incident to his attorney. When he returned to the Jail, he did not immediately request medical attention because he was warned that the request would expose him to more abuse. Instead, Smith filed a grievance about the assault. (ECF No. 173-2 at 8). The following night, Smith was taken from his cell by Berlin to see Defendant Lambert. (*Id.* at 9). After meeting with Lambert, Smith requested a medical examination and was taken to see the nurse. The nurse told Smith there was nothing wrong with him, although she failed to examine his jaw and refused to order an x-ray or send him to the Emergency Room. (*Id.*). From the medical unit, Smith was placed in isolation.

Even though many of the defendants were present and witnessed the alleged assault by Marcum, there is nothing in the record to substantiate that any of the defendants were aware that Smith needed medical attention as a result of the blows. By his own testimony, Smith confirms that he did not fall to the ground, pass out, bleed, scream, cry out, or display an obvious injury at the time of the assault. He did not request medical care from any of the officers standing at his cell, nor did he ask his attorney to arrange for medical care the following day. He did not request care immediately upon returning to the facility. When he asked to see a health care provider two days later, he was taken to the medical unit. Moreover, the nurse told Smith and Lambert that Smith had no serious medical condition requiring treatment. Therefore, the defendants had no reason to believe Smith needed medical care prior to his

placement in the isolation unit. As previously stated, deliberate indifference is a high standard, requiring that the prison official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists ... [and] also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." *Id.* at 844.  Therefore, being present when Smith was assaulted by Marcum, or even being the one who assaulted Smith, is not enough under the factual circumstances present in the record to state a viable claim that the defendants appreciated a substantial risk of serious harm to Smith.

In addition, Smith contends that while in isolation, his Post-Traumatic Stress Disorder ("PTSD") worsened. He claims that he was placed in a small box cell with a mentally ill rapist. The inmates in the isolation unit screamed at all hours of the day and threw excrement around the unit, at each other and the guards. Smith describes being confined in his cell more than 23 hours each day. The unit was bug-infested and filthy. He alleges that the same guards responsible for maliciously placing him in the unit would periodically appear and harass him and the other inmates, checking their "traps." He felt unsafe in the unit. According to Smith, the defendants were aware that he had PTSD because it was on his medical intake form at the Jail. He contends that the defendants also understood that placing him in isolation would cause him severe mental distress, yet they were deliberately indifferent to his psychological needs.

While Smith's description of the unit may be accurate, and certainly such conditions would be distressing to anyone, Smith has not produced any evidence to establish that the defendants had access to his medical records and knew of his PTSD

diagnosis. Assuming *arguendo* that the defendants knew of Smith's PTSD diagnosis, Smith has produced no evidence that the defendants subjectively understood that the circumstances of the isolation unit would and did exacerbate that condition. Finally, even if the defendants knew about the PTSD, and knew that isolation exacerbated the symptoms of PTSD, there still is no evidence that the defendants knew that the exacerbation of symptoms rose to the level of a serious medical condition requiring medical care. Without underlying facts to demonstrate a subjective appreciation by one or more of the defendants that Smith faced a substantial risk of serious harm due to untreated PTSD while in the isolation unit, Smith is unable to sustain a claim for deliberate indifference to his medical needs.

Accordingly, the undersigned **FINDS** that Smith fails to establish a genuine issue of material fact as to his claim that the defendants were deliberately indifferent to his serious medical needs. Thus, the defendants are entitled to summary judgment on the claim.

### C.    *Supervisory Liability*

Smith contends that both Defendants Clark and Lambert should be held responsible for the acts of the remaining defendants under the doctrine of supervisory liability. While claims premised on *respondeat superior* are not permitted under 42 U.S.C. § 1983, *see Monell v. Department of Social Services of City of N. Y.,* 436 U.S. 658, 691 (1978), supervisory officials may be held liable for the constitutional violations of those in their charge when "supervisory indifference or tacit authorization of subordinates' misconduct [is] a causative factor in the constitutional injuries [the subordinates] inflict on those committed to their care." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994) (citing *Slakan v. Porter,* 737 F.2d 368, 372-73 (4th Cir. 1984)). To

state a claim against Defendants Clark and Lambert under this doctrine, Smith must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* at 799. In regard to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* "As to the second element, a plaintiff 'may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Wilkins v. Montgomery,* 751 F.3d 214, 226–27 (4th Cir. 2014) (quoting *Shaw,* 13 F.3d at 799). Finally, when addressing the third element, "proof of causation may be direct ... where the policy commands the injury of which the plaintiff complains ... or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." *Rauch v. West Virginia Div. of Corrections,* No. 2:13–cv-0468, 2014 WL 3732123 (S.D.W.Va. July 25, 2014) (quoting *Wilkins,* 751 F.3d at 226–27) (citations omitted).

In the case of Defendant Clark, Smith has produced no evidence to support his allegations that Clark had actual or constructive knowledge of inmate abuse by a "posse" of correctional officers. Smith argues that Clark must have been aware of the problem given that Smith filed a grievance form; however, Smith's grievance would not have

provided Clark with prior knowledge of the officers' conduct. Consequently, no affirmative causal link could exist between inaction on Clark's part and the constitutional injury suffered by Smith. Furthermore, Smith has produced evidence indicating that the correctional officers went to great lengths to hide their abusive behavior from upper administration at the Jail. For example, Smith testified that other inmates discouraged him from reporting abuse by correctional officers, or requesting medical attention, advising him that the guards will "beat you again." (ECF No. 141-5 at 10). Smith was also told by one correctional officer, that it did no good to report his assault, because the guard would "lie and say he didn't do it anyway or say you assaulted him first." (Tr. of Smith Dep. at 193-unfiled). According to Smith, the nurses in the Medical Unit covered up for the correctional officers, and when inmates did not cooperate by being silent, they would be put in isolation, like he was, to keep them quiet. Moreover, Smith produced disciplinary records establishing that at least some of the defendants in the instant action were later terminated from their positions at the Jail for abusing an inmate and then falsifying documents to cover-up the incident; again, demonstrating their efforts to hide these occurrences from upper administration. (ECF Nos. 141-1, 141-2, 141-4). For these reasons, Smith's allegations against Clark should be dismissed.

In contrast, Smith has produced evidence to support his allegations against Defendant Lambert, creating a genuine issue of material fact as to Lambert's liability. Applying the test in *Shaw,* to meet the first prong, Smith must produce evidence to show that the defendant correctional officers used excessive and unjustified force against other inmates either on a widespread basis, or at least on several different occasions. Defendant Lambert argues that Smith is unable to meet this prong because

Smith's only evidence of such abuse is hearsay testimony regarding what other inmates allegedly told him. (*See* ECF No. 176 at 6). Contrary to Lambert's argument, however, Smith has supplied several pieces of evidence substantiating his claim that at least some of the defendants had on more than one occasion abused inmates. (ECF No. 7 at 2, ECF No. 35 at 2-3, ECF No. 141-1 at 1, 2, 7-10, ECF No. 141-2 at 1, 2, 7-10). Although the evidence is not entirely clear as to how long the problem existed prior to Smith's arrival at the Jail, and how many inmates were purportedly victimized, when viewing the evidence in the light most favorable to Smith, including the disciplinary letters, the affidavits of the two inmates, the incident reports, and Smith's testimony, there are genuine issues of material fact regarding the conduct of Lambert's subordinates— particularly Marcum and Berlin—toward inmates, such that a reasonable jury hearing all of the evidence could conclude that this conduct was physically abusive and sufficiently widespread so as to constitute a "pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff."

Smith has also produced evidence that Lambert was aware of the conduct and either condoned it or participated in it by actively assisting the officers in covering it up. This issue was directly addressed in his disciplinary records when an investigation revealed that he failed to provide a complete, true, and accurate incident report regarding the beating of an inmate who was restrained at the time of the assault. (ECF No. 141-4 at 11-13). Moreover, Smith testified that after he completed his incident report detailing the harassment and assault he received at the hands of Defendant Marcum and the others, (ECF No. 141-5 at 10), Smith wound up in isolation based upon falsified paperwork generated by Lambert. (ECF No. 141-5 at 12). Indeed, a review of the paperwork surrounding Smith's transfer to isolation tends to corroborate Smith's

version of events, while calling into question Lambert's motives and actions.

The discrepancies begin with Berlin's incident report. Berlin claimed that an inmate waved him into Smith's pod for the sole purpose of reporting that Smith had locked himself into his cell. (ECF No. 173-4). Given that it was 10:10 p.m., and all of the cells were locked at 11:00 p.m. anyway, this hardly seems like a matter of such importance that an inmate would be inclined to voluntarily invite the attention of a correctional officer. According to Smith, he and his cellmate were already in bed, and his cellmate had locked the cell door so that he could go to sleep. Berlin, however, for no apparent reason insisted that Smith's cell door be unlocked remotely, and then ordered Smith to pack his belongings, so that Berlin could "rehouse" him. (*Id.*). No purpose was given in the incident report for moving Smith a mere 45 minutes before night lockdown. Smith was not described as being angry, aggressive, violent, or disrespectful, and was not noted to be behaving inappropriately or strangely. Smith did not initiate the contact with Berlin. Only after Berlin roused him for no good reason did Smith ask to speak with a superior officer, and Berlin took Smith to see Lambert.

Lambert prepared an incident report regarding his discussion with Smith, indicating that Smith stated he was assaulted by Berlin and Evans on October 19, 2012, although the handwritten report given to Lambert by Smith clearly documented that Smith was confronted by Berlin and four other correctional officers on October 20, 2012 and was hit twice by Officer Blevins (later identified as Marcum). (ECF No. 187 at 27, ECF No. 141-5 at 10). Lambert noted that Smith had told his attorney and a judge about the assault, although Smith wrote that he told his attorney and the prosecutor. Lambert also stated that he spoke with the inmates on Smith's pod, who described Smith as nuts, and a jailhouse lawyer, and claimed that they wanted no part of him. Lambert wrote in

24

this incident report that he placed Smith in protective custody ***at Smith's request*** for his own protection. Not only is there no explanation as to who is supposedly threatening Smith, but this statement directly conflicts with the Inmate Reclassification Summary prepared by C.O. Cazad, which clearly explains that Smith was placed in protective custody pursuant to the orders of Sergeant Lambert "due to strange behavior by inmate." (ECF No. 141-5 at 12; ECF No. 187 at 37). Both Lambert's incident report and the Inmate Reclassification Summary are contested by Smith. Certainly, no other document in evidence substantiates Lambert's statement in the incident report that Smith requested protective custody, and in light of the other evidence, that statement appears implausible. Similarly, nothing in the record corroborates Lambert's representation to C.O. Cazad that Smith was behaving strangely. Therefore, one logical conclusion is that Lambert placed Smith in isolation without justification or cause, and then had to fabricate a reason for doing so. However, in his rush to concoct a basis for his order, he wound up providing two different explanations. Thus, Lambert's credibility is at issue. Likewise, Lambert's knowledge and participation in the allegedly unconstitutional behavior of his subordinates is at issue, such that a jury could reasonably conclude that his actions on the night of October 22, 2012 were designed to condone and cover-up the physical assault of Smith, and that Lambert had a practice of doing this, as was subsequently stated and documented in his disciplinary records.

Finally, from a causation standpoint, Smith can certainly argue that had Lambert properly managed the incident on October 17, 2012, (ECF Nos. 141-1, 141-2, 141-4), neither Berlin nor Marcum would have been present or empowered to prey upon Smith on October 20, 2012. The disciplinary record indicates that Lambert not only failed to properly supervise his subordinates, he participated in violating the policies and

25

procedures of the facility, as well as the constitutional rights of the inmate. Given that scenario, a genuine issue of material fact exists on the issue of causation.

Accordingly, the undersigned **FINDS** that Defendant Clark is entitled to dismissal of Smith's supervisory liability claim against him; however, there is sufficient evidence in the record to defeat Defendant Lambert's motion for summary judgment on the claim of supervisory liability.

### D.    *Retaliation Claims*

Smith asserts that he was threatened, intimidated, beaten, and placed in isolation in retaliation for engaging in two constitutionally protected activities. First, he accessed the Jail's grievance procedure to complain about the lack of a mattress and to report his physical abuse at the hands of the correctional officers. Second, he offered to assist other inmates in pursuing legal claims against the "posse" of correctional officers that were terrorizing the inmates.

To state a claim for retaliation under § 1983, Smith "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir. 1994). In regard to his use of the Jail's grievance process, Smith alleges that he was retaliated against for exercising his First Amendment right to complain about his conditions of confinement. A First Amendment retaliation claim contains three essential elements; thus, to defeat a motion for summary judgment, Smith must establish that: (1) his speech was protected; (2) the defendants' alleged retaliatory action adversely affected his constitutionally protected speech; and (3) a causal relationship exists between the his speech and the defendants' retaliatory action. *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685–86 (4th Cir. 2000).

The Fourth Circuit has not published an opinion on whether an inmate exercises a First Amendment right when he uses the prison's grievance process. Two unpublished opinions are somewhat inconsistent. *See Daye v. Rubenstein,* 417 F.App'x 317, 319 (4th Cir. 2011), *cert. denied,* 132 S.Ct. 161 (2011) (Inmate did not have constitutional right to access internal prison grievance process, and grievance not constitutionally protected), although an older opinion provides the contrary impression. *But see Gullet v. Wilt,* 869 F.2d 593 (4th Cir. 1989) ("The First Amendment grants the rights to free speech and to seek redress of grievances. These rights, to a limited extent, exist in a prison setting."). However, "[s]even [sister] circuits appear to have held that prison grievances implicate a prisoner's First Amendment rights of free speech and to seek redress of grievances." *Ansel v. Hicks,* No. 1:11–cv–114–RJC, 2012 WL 4511187, at *10 (W.D.N.C., Sept. 30, 2012) (collecting cases).[3] Assuming that Smith may state a First Amendment retaliation claim based upon the filing of his grievance, then he meets the first element of the three required elements.

Smith can also produce evidence to show a causal connection between his filing of grievances about his physical assault and his placement in the isolation unit. By the

---

[3] The Court cited the following:

*See Hill v. Lappin,* 630 F.3d 468, 472 (6th Cir.2010) (recognizing a prisoner's "undisputed First Amendment right to file grievances against prison officials on his own behalf"); *Gee v. Pacheco,* 627 F.3d 1178, 1189 (10th Cir.2010) (recognizing the filing of grievance as a protected First Amendment right); *Haynes v. Stephenson,* 588 F.3d 1152, 1155–56 (8th Cir.2009) ("The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity."); *Bibbs v. Early,* 541 F.3d 267, 272 (5th Cir.2008) (holding that plaintiff stated a cognizable claim where prison officials allegedly subjected him to sub-freezing temperatures for four consecutive nights in retaliation for filing grievances); *Boxer X v. Harris,* 437 F.3d 1107, 1112 (11th Cir.2006) ("First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment."); *Rhodes v. Robinson,* 408 F.3d 559, 568 (9th Cir.2005) (holding that plaintiff stated a claim where he alleged prison officials destroyed property, threatened transfer, and assaulted him in retaliation for filing grievance and lawsuit); *Gill v. Pidlychak,* 389 F.3d 379, 384 (2d Cir.2004) (holding that plaintiff stated a claim where prison officials allegedly issued false misbehavior reports and sentenced him to three weeks in "keeplock" in retaliation for using grievance system).

time he was taken to see Lambert, Smith had filed his first grievance form, in which he detailed the assault in his cell and threatened to file a § 1983 action against the "posse" on his own behalf, and on behalf of others similarly attacked in the Jail. (ECF No. 141-5 at 7). Before leaving Lambert's company that night, he prepared a second grievance form, in which he stated that he had made a complaint to the Putnam County Prosecutor and was told to follow-up with the West Virginia State Police and submit a complaint regarding the physical assault. (*Id.* at 10). As Smith points out, after he went to see Lambert and completed the second grievance form, which he gave to Lambert, Smith was taken to the Medical Unit. Smith testified that Lambert spoke alone with the nurse before taking Smith in for examination. Although Smith complained about an injury to his jaw, after talking to Lambert, the nurse refused to examine or x-ray Smith's jaw. The nurse's notes are void of any comments pertaining to Smith's face or jaw despite his story that he was struck in the face. After leaving the Medical Unit, Smith was placed in isolation upon Lambert's orders even though all of Smith's belongings were still in his old cell. Lambert supplied two different explanations on the record for why Smith was placed in isolation. On one record, Lambert indicated that he "rehoused inmate Smith to A-8-3 PC for his protection per his request," (ECF No. 175-5 at 2), and on another record, C.O.Cazad documented that Smith was placed in protective custody "per Sgt. Lambert for Inmate's safety due to strange behavior by inmate 10/22/12." (ECF No. 141-5 at 12). According to Smith, both records are false, and nothing in evidence corroborates either record.

Nevertheless, Smith is unable to sustain the second prong of the claim. He has not produced any evidence showing that his placement in isolation impeded his ability to file grievances. While Smith was in isolation, he filed several grievances related to his

segregation. Because Smith was able to freely exercise his First Amendment rights, he cannot sustain a claim for retaliation.

Smith's second retaliation claim is based upon his supposition that Lambert placed him in isolation after learning from the other inmates that Smith offered to help them with their legal claims. "Retaliation against an inmate for the exercise of his right to access the courts states a cognizable claim." *McFadden v. Lewis*, 517 F.App'x. 149 (4th Cir. 2013) (citing *Hudspeth v. Figgins,* 584 F.2d 1345, 1347–48 (4th Cir. 1978). This remains the case even if the act would have been proper if taken by the prison official for different reasons. *Id.* (citing *American Civ. Liberties Union v. Wicomico Cnty.,* 999 F.2d 780, 785 (4th Cir.1993). To state a retaliation claim in this context, Smith "must allege sufficient facts to warrant concern that the alleged retaliation might have a chilling effect on the exercise of the right to access the courts and show that he suffered more than de minimis inconvenience." *McFadden,* 517 F.App'x at 150 *(citing Wicomico,* 999 F.2d at 785–86 & n.6.). Smith need not demonstrate that the retaliatory act prevented his access to the court, only that it was intended to have that effect "and was reasonably calculated to have that effect." *Id.* (citing *Hudspeth,* 584 F.2d at 1348). "The prisoner need not succumb entirely or even partially to the threat; it is sufficient that the retaliation was intended to limit the prisoner's right of access to the court." To carry his burden, Smith must allege specific facts, as "bare assertions of retaliation do not establish a claim of constitutional dimension." *Adams,* 40 F.3d at 74–75.

Smith's retaliation claim based upon this ground also lacks one essential element. In order to succeed on this claim, Smith must have a constitutional right to assist other inmates with their legal claims and grievances. No such right exists. *Neal v. Stouffer,* No. PJM–12–524, 2013 WL 693036, at *6 (D.Md. Feb. 25, 2013) (citing *Thaddeus–X v.*

*Blatter* 175 F.3d 378, 395 (6th Cir. 1999). As the Sixth Circuit stated in *Thaddeus–X v. Blatter,* "an inmate does not have an independent right to help other prisoners with their legal claims. Rather, a 'jailhouse lawyer's' right to assist another prisoner is wholly derivative of that prisoner's right to access the courts." *Id.* Smith relies heavily on the *Thaddeus-X* decision for the proposition that any intentional act impeding his ability to provide legal assistance satisfies the first prong of the retaliation test; however, Smith fails to appreciate the fine distinction made by the Sixth Circuit in the case of Plaintiff X's retaliation claim. The Court explained that "only if X's assistance is necessary to vindicate [the co-plaintiff's] right of access to the courts can X, too, state a claim of retaliation." *Id.* Thus, before X could state a claim of retaliation based on interference with his provision of legal services, he had to produce evidence demonstrating that without his assistance, a particular inmate, the co-Plaintiff, would be denied access to the courts. Smith has not made such a showing in this case. *See also Smith v. Maschner,* 899 F.2d 940, 950 (10th Cir. 1990) (a jailhouse lawyer does not have a protected interest in providing legal services to other inmates); *Beese v. Todd,* 35 F. App'x 241 (7th Cir. 2002) (same).

Nonetheless, Smith has submitted sufficient evidence to establish a genuine issue of material fact as to whether Lambert retaliated against him for exercising his constitutional right to report the assault to the prosecutor, seek assistance from the State Police in investigating the matter, and pursue legal recourse on his own behalf. Viewing the evidence in the light most favorable to Smith, the disciplinary records and prisoner affidavits submitted by Smith suggest that Berlin and Marcum had apparently used excessive force with inmates prior to October 20, 2012, and Lambert had been involved in at least one such incident and participated in covering up the wrongdoing.

Arguably, Lambert had a reason to protect Marcum, Berlin, and other correctional officers in his charge. Smith filed a grievance on October 20, 2012 complaining that correctional officers, including some of the same officers Lambert had protected in the past, had assaulted him, and Smith intended to file a civil rights action. Lambert spoke with Smith and allegedly made it clear that he did not intend to help Smith. (ECF No. 173-2 at 10). When Smith did not back down, Lambert told Smith, "You just don't learn, do you?" (*Id.*). At Lambert's request, Smith completed another statement, advising that he had reported the assault to a prosecutor and was told to notify the State Police. Upon learning this, Lambert immediately went to speak with all of the inmates in Smith's pod, and then prepared an incident report claiming that the inmates called Smith a "nut." Shortly thereafter, Lambert sent a correctional officer to obtain written statements from the inmates, confirming that they did not witness an assault. At the same time, Lambert ordered Smith to be rehoused to isolation, where he would be unable to speak with any of the inmates or contact the State Police. Smith was not allowed to return to the pod to obtain his possessions, and was not given an explanation or justification for his transfer.

This claim does not lack any of the essential elements. Undoubtedly, placement in isolation would have a chilling effect on an inmate's exercise of his right to access the courts and would cause more than de minimis inconvenience. The fact that Smith was able to pursue his legal action despite the circumstances does not preclude this claim so long as he can establish that Lambert's intent was to impede his ability to develop and litigate his claims, and the transfer was reasonably intended to achieve that goal.

Accordingly, as Defendant Lambert is the only individual that played a role in placing Smith in isolation, the undersigned **FINDS** that all of the defendants are

entitled to summary judgment on Smith's claims of retaliation, except for Defendant Lambert.

### E.   *Conspiracy Claims*

To the extent Smith alleges a conspiracy under § 1983, he must show that (1) an agreement existed between the defendants to jointly deprive him of a constitutional right, and (2) an overt act was taken by one or more of the conspirators, which resulted in a constitutional deprivation. *Hinkle v. City of Clarksburg,* 81 F.3d 416, 421 (4th Cir. 1996). "To meet the 'weighty burden to establish a civil rights conspiracy[,]' ... '[Smith] must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective.'" *Marshall v. Odom,* 156 F.Supp.2d 525, 532 (D.Md. 2001) (quoting *Hinkle,* 81 F.3d at 421). Proof of a "meeting of the minds" is essential to establishing the claim, because the independent acts of the defendants, even when done together, do not constitute a conspiracy. *Murdaugh Volkswagon v. First Nat'l Bank,* 639 F.2d 1073, 1075–76 (4th Cir. 1981) (The agreement must be clear because "[i]ndependent acts of wrongdoers do not make a conspiracy.") Conclusory allegations are generally insufficient to support a claim of conspiracy. *Brown v. Angelone,* 938 F.Supp. 340, 346 (W.D.Va. 1996). While courts are "mindful that direct evidence of a conspiracy is rarely available and that the existence of a conspiracy must usually be inferred from the circumstances ...; [nevertheless] the rule is clear that allegations of a conspiracy must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Supreme Ct. of N.J.,* 588 F.3d 180, 185 (3d Cir. 2009) (quoting *Crabtree v. Muchmore,* 904 F.2d 1475, 1481 (10th Cir. 1990)).

In regard to filing grievances, Smith claims that all of the defendants conspired to threaten, intimidate, and beat him in retaliation for exercising his First Amendment right to complain about the conditions of confinement at the Western Regional Jail. As to his offer to assist other inmates in accessing the court system, Smith claims that Defendants Berlin and Lambert, in particular, conspired to retaliate against him for trying to expose their "posse," and then carried out the conspiracy by placing him in the isolation unit. Smith claims that while in isolation, he was deprived of the materials he needed to access the courts and was forced to live in substandard conditions. According to Smith, Defendant Lambert falsified paperwork to make it appear that Smith had requested isolation for "protective custody," when, in truth, Lambert and Berlin were sadistically and maliciously placing Smith in isolation to punish and deter him. As evidence of their ulterior motive, Smith points out that although he was supposed to be in protective custody, which required a private cell, he was placed in a small box cell with a mentally ill rapist. Smith adds that the inmates in isolation screamed all night and threw urine and feces around in the unit. Several of the defendants appeared from time-to-time to "shake down" the cells. Smith claims this was done to psychologically torture him because the defendants were well aware that he had a longstanding diagnosis of PTSD, a fact that had been communicated to the Jail at the time of his initial booking.

Although one can infer that the correctional officers conspired to verbally harass and intimidate Smith on the night of October 20, 2012, when they all showed up at his cell to escort him to and from the mattress storeroom, Smith has produced no evidence, direct or indirect, that the defendants had a meeting of the minds to physically assault him. Even Smith apparently conceded that at least two of the defendants, Vanmeter and

Goodwin, did not appear to be part of the original plan, and two other defendants, Clark and Lambert, were not present or in any way involved in the escapade. (ECF No. 171 at 4-5). Smith also conjectured that Berlin's scheme was to provoke Smith into initiating the physical altercation thereby giving the officers justification to use force against him. However, all of this is mere speculation. While there is evidence that Marcum, Berlin, and Blankenship had on their own, or together, assaulted inmates in the past, that evidence is not significantly probative of whether the defendants conspired to use excessive force against Smith on October 20, 2012; particularly, in the absence of any other evidence tending to support the existence of a specific agreement or plan between them. Therefore, Smith's conclusory allegations regarding the remaining defendants simply do not support a claim of conspiracy.

Accordingly, the undersigned **FINDS** that the defendants are entitled to summary judgment on Smith's conspiracy claims.

### F. *Americans with Disabilities Act*

Smith contends that with his diagnosis of Post-Traumatic Stress Disorder, he is protected under the provisions of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"). Given that he is claiming constitutional violations by the defendants, resulting in psychological injuries, Smith seeks damages under the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Federal regulations implementing Title II require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid

34

discrimination unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 25.130(b)(7). Title II of the ADA does apply to state prisons and their inmates. *See Pennsylvania Department of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1988). Moreover, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates a states Sovereign immunity." *United States v. Georgia,* 546 U.S. 151, 156, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006). To state a claim under Title II, Smith must show (1) that he is a qualified individual with a disability; (2) that he was denied participation in, or denied benefits of the services, programs or activities of the Jail, or was otherwise discriminated against; and (3) the denial or discrimination was because of his disability. 42 U.S.C. § 12132.

Smith has not alleged any facts that would state a claim under the ADA. In his amended complaint, Smith claims that he was targeted for abuse simply for requesting a mattress. (ECF No. 21 at 6). Throughout his filings, Smith makes clear that the "posse" of defendants routinely harassed and intimidated inmates that they perceived as "whistleblowers," or that the defendants felt asked for too much. At no place in the many pages of argument or evidence is there anything to suggest that Smith or any of the other alleged targets of abuse was singled out for discriminatory treatment on the basis of a disability.

According, the undersigned **FINDS** that Smith is not entitled to damages under the ADA.

## V.   <u>Proposal and Recommendation</u>

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the United States District Judge accept and adopt the findings herein and **RECOMMENDS** the following:

1.      The Motions for Summary Judgment of Defendants Goodwin, Vanmeter, Berlin, Blankenship, and Clark be **GRANTED,** (ECF Nos. 170, 173, 175), and these defendants be removed from the style of the case.

2.      The Motion for Summary Judgment of Defendant Lambert be **GRANTED,** in part, and **DENIED,** in part. (ECF No. 175). All of Plaintiff's claims against Defendant Lambert, except the claims based upon supervisory liability and retaliation, should be dismissed. The claims based upon supervisory liability and retaliation should proceed to trial;

3.      The Motion of William Smith in Opposition to Defendants' Motions for Summary Judgment be **GRANTED**, in part, and **DENIED**, in part. (ECF No. 180). In addition, to the above-stated claims against Defendant Lambert, Plaintiff's claims against Defendant Marcum based upon the use of excessive force in violation of the Eighth Amendment to the United States Constitution and upon a State claim of battery should also proceed to trial;

4.      The presiding District Judge reconsider Plaintiff's motion for the appointment of counsel, (ECF No. 88), which was denied without prejudice, and appoint counsel to assist Plaintiff at the trial of this civil action; and

5.      A pretrial and trial schedule issue.

 The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure. The parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the

"Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Plaintiff, Defendants, counsel of record, and any unrepresented party.

**FILED:** August 28, 2014

Cheryl A. Eifert
United States Magistrate Judge